727 A.2d 358

Carol L. CALOMIRIS

v.

Caryn M. WOODS.

No. 70, Sept. Term, 1998.

Court of Appeals of Maryland.

March 15, 1999.

Reconsideration Denied May 11, 1999.

426

Roger A. Hayden, II (Theresa M. Hall, Pasternak & Fidis, P.C., on brief), Bethesda, for Petitioner.

Richard C. Daniels (Lani L. Daniels, Daniels & Daniels, on brief), College Park, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

This controversy raises important questions for the interpretation of contracts when a party alleges that a contract is ambiguous and seeks to admit extrinsic evidence to show the intent of the contracting parties. Factually, the case involves the interpretation of a release provision of a mortgage contract covering about six acres of land in Howard County. The trial court found the provision ambiguous and used extrinsic evidence to determine the amount that the Respondent must pay to obtain a release from the mortgage. Applying a *de novo* standard of review, we conclude that, viewed objectively, the release provision is unambiguous. We therefore reverse, holding that the trial court erroneously admitted extrinsic evidence and interpreted the contract in contradiction to its express terms.

I.

The dispute arises out of the 1992 purchase for $1.2 million of 38 acres of undeveloped land in Howard County. New

Panorama Development Corporation (New Panorama) purchased the property from Robert F. Simpson, who secured $654,000 of the purchase price with a mortgage. The mortgage covered Lot 126, which contained a little more than six acres, and was dated December 31, 1992. In 1995, New Panorama subdivided Lot 126 into two lots, creating Lot 130, about which this dispute centers. New Panorama enlarged Lot 130 by 2,200 square feet from adjacent land unencumbered by the Simpson mortgage. Lot 130 was transferred in August, 1995, to Lovell Regency Homes (Lovell). After constructing a single family residence on the property, Lovell sold the property to Respondent Caryn Woods (Woods) on February 23, 1996.

Lovell did not record its deed from New Panorama until February 26, 1996, three days after it had sold the property to Woods. The deed to Woods was not recorded until the afternoon of March 13, 1996. By that time, the Simpson mortgage had matured and was in default. The trustees of the Simpson mortgage filed for foreclosure on the mortgage for the full amount, $654,000.[1] A foreclosure sale took place in the morning of March 13, 1996, only a few hours before the Woods deed was recorded. Exceptions to the foreclosure were filed by numerous parties, including New Panorama, Lovell, and Woods. In July 1996, Woods filed a petition for reformation and partial release of the mortgage. Woods' petition argued that the transfer of Lot 130 to Lovell and then to her without obtaining a partial release was by inadvertence and mistake, and requested the trial court to set a partial release amount, which Woods' title insurer was willing to pay. The mortgagee filed a motion for summary judgment. The trial court granted the mortgagee's request for summary judgment as to the claim for reformation, but allowed the petition to set a figure for partial release to proceed.

---

1. Hereinafter, this opinion shall refer to the trustee responsible for enforcing the Simpson mortgage as the "mortgagee." That trustee currently is Carol L. Calomiris, the Petitioner in this case, but prior trustees were the parties to earlier proceedings in the litigation giving rise to this petition.

The ruling on the petition for partial release is what is before us. Woods' request for a partial release of the mortgage is based on the following provision in the mortgage contract between New Panorama and Simpson:

"Upon request of the Mortgagor, Mortgagee shall release portions of the mortgaged premises as follows:

Subdivided lots shall be released by payment by Mortgagor to Mortgagee of an amount equal to $752,100.00 [2] *divided by the total number of subdivided residential building lots in a recorded subdivision plat of the mortgaged premises, from time to time.*

All releases shall be prepared at the expense of Mortgagor and shall be executed by the Mortgagee when requested by Mortgagor.

Mortgagee shall not unreasonably refuse to execute or join in the execution of plats of subdivision, record plats, deeds or other grants of rights of way and easements for the installation and maintenance of sanitary rights of way and easements for the installation and maintenance of sanitary sewers, storm drainage, water, electricity and other utilities for the benefit of the mortgaged premises; provided such execution or joinder does not subject the Mortgagee to any cost, liabilities or expenses in connection therewith." (Emphasis added).

While most of the mortgage contract consists of a standard form, with the specifics of the transaction typed into blank spaces, the entire release provision quoted above appears not to be a part of the standard form, but rather inserted by the contracting parties, as evidenced by the different and slightly larger typeface of the release provision.[3]

---

**2.** The $752,100 figure appears to be based on 115 percent of the total mortgage of $654,000.

**3.** The different and larger typeface is consistent with provisions obviously inserted into the standard mortgage contract by the contracting parties, including the names of the parties and financial figures.

The emphasized text from the excerpt quoted above, which describes how the partial release figure will be computed, is the contractual language that has been the main point of contention in this dispute. The trial court "specifically [found] that the release provision is sufficiently ambiguous that extrinsic evidence needs to be considered in determining the intention of the parties at the time the mortgage was executed." The court gave no explanation of its finding of ambiguity in its written order other than the statement just quoted. The trial court then considered evidence of negotiations taking place prior to the execution of the mortgage, admitting into evidence exhibits and testimony from four witnesses. Based on this evidence, the court concluded that "the parties never intended to create a situation where one lot ... would bear the entire burden of the mortgage." Referring to a letter written by an attorney representing the mortgagee on May 4, 1992, more than six months prior to the signing of the mortgage, the trial court found that "[e]vidence adduced at trial established the fact that *pro rata* release prices had been discussed by the parties." The trial court then concluded that a *pro rata* release, *i.e.*, basing the partial release on the acreage of encumbered land in the Woods lot relative to the total land subject to the mortgage, was the "fair and equitable result." It rejected as leading to "an unfair and unreasonable result" the interpretation proposed by the mortgagee, that the denominator by which to divide the total amount of the mortgage was one, since the Woods lot was the only platted and recorded residential building lot on the mortgaged property. The court therefore arrived at a partial release figure of $21,058.80 by computing the percentage of encumbered land in Woods' lot (7,416 square feet) relative to the total land encumbered by the mortgage (267,101.21 square feet) and multiplying that percentage (2.8%) by the total release amount of $752,100.00.

In an unreported opinion, the Court of Special Appeals applied a clearly erroneous standard to affirm the trial court's finding of ambiguity. Under that standard, the court said it would had to have found "no reasonable suggestion of ambigu-

ity" in the contractual language in order to reverse the trial judge's finding of ambiguity. The intermediate appellate court pointed to the specific contract language "from time to time" as ambiguous. Judge Kenney dissented on the grounds that the release provision was clear in setting the release based on the total number of subdivided residential building lots then platted and recorded and that the trial court's method of determining the release price was not reflected in the language of the mortgage contract nor in the negotiations.

We granted certiorari in order to address the issues of contract interpretation raised in this case. *Calomiris v. Woods*, 350 Md. 279, 711 A.2d 871 (1998).[4]

## II.

As just described, the trial court in this case declared the partial release provision ambiguous and then sought to ascertain the intent of the parties through the use of evidence extrinsic to the contract itself. These actions implicate the role of the judiciary in contract interpretation and the use of extrinsic evidence for interpretative purposes. Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term. *Equitable Trust Co. v. Imbesi*, 287 Md. 249, 271–72, 412 A.2d 96, 107 (1980). Under the parol evidence rule, a written agreement "discharges prior agreements," thereby rendering legally inoperative communications and negotiations leading up to the written contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 213 (1979). The re-

---

4. We reject without further discussion Woods' contention that this appeal is moot because the mortgagee foreclosed on another lot subject to the same mortgage while this appeal was pending. Counsel for Woods conceded at oral argument that there is no clear rule of law in Maryland that the foreclosure of one lot subject to a mortgage extinguishes that mortgage with respect to another lot which is subject to the same mortgage. Furthermore, the record indicates that Woods did not file any exceptions to the foreclosure action and in fact cooperated with the mortgagee so as to ensure that the Woods lot was clearly excluded from the foreclosure sale precisely because this petition was pending.

quirement that courts give legal effect to the unambiguous provisions of a contract and the rule that prohibits the admission of parol evidence for ascertaining the parties' intent provide a necessary legal foundation for the certainty of contracting parties. As Professor Farnsworth has observed, there are often times in which contracting parties,

"after concluding their negotiations, want to simplify the administration of the resulting contract and to facilitate the resolution of possible disputes by excluding from the scope of their agreement those matters that were raised and dropped or even agreed upon and superseded during the negotiations. It is often useful to be able to replace the negotiations of yesterday with an authoritative agreement of today."

E. ALLAN FARNSWORTH, II FARNSWORTH ON CONTRACTS § 7.2, at 214–15 (1998).

As with many legal rules, however, there are situations that render the rule inoperable. All courts generally agree that parol evidence is admissible when the written words are sufficiently ambiguous. E. ALLAN FARNSWORTH, II FARNSWORTH ON CONTRACTS § 7.11, at 292 (1998). The remainder of this part of the opinion (1) explains the appropriate standard by which the appellate courts should address a trial court's ruling on a party's claim of contract ambiguity, (2) considers the appropriate substantive test for determining whether contractual language is ambiguous, and (3) reviews some of our prior decisions on the ambiguity exception to the rule against admitting extrinsic evidence for contract interpretation. Part III of the opinion then applies this law to the dispute raised in the instant case.

## A.

Initially, we address the appropriate standard of review for interpreting the terms of the mortgage. As noted above, the Court of Special Appeals applied a clearly erroneous standard to uphold the trial court's finding of ambiguity, relying as authority for its application of this standard on *Admiral*

*Builders v. South River Landing,* 66 Md.App. 124, 128, 502 A.2d 1096, 1098 (1986). Quoting that case, the court said it would have had to find "no reasonable suggestion of ambiguity" in the contractual language in order to reverse the trial court's holding. We disagree.

The rules of contract interpretation apply to our review of the language of a mortgage. *Leisure Campground v. Leisure Estates,* 280 Md. 220, 226–27, 372 A.2d 595, 600 (1977), quoting *Chapman v. Ford,* 246 Md. 42, 51, 227 A.2d 26, 31 (1967)(" 'The mortgage is not only a security instrument, it is also a contract between the parties.' "). We have frequently stated the general rule that "[t]he question of whether a contract is ambiguous ordinarily is determined by the court as a question of law." *State Highway v. Bramble,* 351 Md. 226, 239, 717 A.2d 943, 949 (1998). *See also JBG/Twinbrook Metro Ltd. v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898, 911 (1997) ("[T]he interpretation of a written contract is ordinarily a question of law for the court."); *Suburban Hospital v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069, 1075 (1991), quoting *Gordy v. Ocean Park, Inc.,* 218 Md. 52, 60, 145 A.2d 273, 277 (1958)(" '[A]s a general rule, the construction or interpretation of all written instruments is [initially] a question of law for the court. . . .' "); *Rothman v. Silver,* 245 Md. 292, 296, 226 A.2d 308, 310 (1967)("If a written contract is susceptible of a clear, unambiguous and definite understanding, . . . its construction is for the court to determine.").

Thus, the determination of ambiguity is one of law, not fact, and that determination is subject to *de novo* review by the appellate court. As in the case of a review of an order of summary judgment, *de novo* review is appropriate because the appellate court's determination of whether written contractual language is ambiguous turns on whether the trial court was legally correct. *See Heat & Power v. Air Products,* 320 Md. 584, 590–92, 578 A.2d 1202, 1205–06 (1990).[5] In *Heat &*

---

**5.** Motions for summary judgment are governed by Maryland Rule 2–501, which states in pertinent part:

*Power,* we observed that an appellate court reviewing a trial court's ruling on a motion for summary judgment "has the same information from the record and decides the same issues of law as the trial court." 320 Md. at 591–92, 578 A.2d at 1206. The same is true in determining whether a written contract is ambiguous; the review is essentially a "paper" review where the same contractual language is before the appellate court as was before the trial court. Since neither the credibility of witnesses nor the evaluation of evidence, other than the *written* contract, is in issue, the policy reasons behind deferring to the trial judge under the clearly erroneous standard are inapplicable.

■ The standard of review afforded the trial court's ruling on ambiguity differs from the standard applied to a trial court's factual findings based on parol evidence after the court has determined that the contract language is ambiguous. Should the appellate court agree with the trial court's finding of ambiguity, it will apply a clearly erroneous standard to the trial court's assessment of the construction of the contract in light of the parol evidence received. In sum, on appeal, *de novo* review applies to the initial determination of whether contractual language is ambiguous, and the clearly erroneous standard comes into play only after the trial court's finding of ambiguity is upheld. Therefore, the Court of Special Appeals erred in this case by deferring under the clearly erroneous standard to the trial court's finding that the contract language was ambiguous.

### B.

■ In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts. *State v. Attman/Glazer,* 323 Md. 592,

---

"(e) *Entry of judgment.* The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

604, 594 A.2d 138, 144 (1991); *Cloverland, Inc. v. Fry*, 322 Md. 367, 373, 587 A.2d 527, 530 (1991); *Feick v. Thrutchley*, 322 Md. 111, 114, 586 A.2d 3, 4 (1991); *General Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *Orkin v. Jacobson*, 274 Md. 124, 128, 332 A.2d 901, 903 (1975); *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 328, 301 A.2d 12, 17–18 (1973). Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning. *Heat & Power*, 320 Md. at 596, 578 A.2d at 1208; *Truck Ins. Exch.v. Marks Rentals*, 288 Md. 428, 433, 418 A.2d 1187, 1190 (1980). The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985).

■ Therefore, when interpreting a contract the court's task is to:

> "[D]etermine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."

*General Motors Acceptance*, 303 Md. at 261, 492 A.2d at 1310. Thus, while evidence of prior intentions and negotiations of the parties is inadmissible, the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity.

C.

We have frequently barred the admission of extrinsic evidence when the written contractual language is unambiguous. In *Jenkins v. Karlton,* 329 Md. 510, 524–26, 620 A.2d 894, 897–99 (1993), we addressed whether a promissory note containing a due date of "on demand" was payable on demand, or whether extrinsic evidence of communications between the parties subsequent to the signing of the note could be used to show that it was not payable on demand. We concluded that

"[t]he only purpose for which the evidence ... was offered was to prove the parties' intention concerning when the promissory note was payable. On that point, the note is clear and unambiguous, however. By its terms, Jenkins unconditionally agreed to pay the note, according to its terms, on demand. Consequently, parol evidence was not admissible to inject a condition not apparent on the face of the note."

*Jenkins,* 329 Md. at 525–26, 620 A.2d at 902. *See also, e.g., General Motors Acceptance,* 303 Md. at 262, 492 A.2d at 1310–11 (holding parol evidence not admissible to prove secondary liability as guarantor where individual who co-signed a contract to purchase an automobile for his brother signed the contract as a "buyer" and where "[t]he contract clearly stated that all buyers agreed to be jointly and severally liable," thereby establishing primary liability as a surety); *Annapolis Mall v. Yogurt Tree,* 299 Md. 244, 251, 473 A.2d 32, 36 (1984)(holding that the trial court erred by allowing the tenant to present evidence that the rent was to commence upon the opening of its retail business even though that testimony contradicted the unambiguous terms of the written lease); *Delmarva Drilling Co. v. Tuckahoe,* 268 Md. 417, 426, 302 A.2d 37, 41 (1973)(holding that parol evidence of well driller's prior or contemporaneous promise to supply "usable water" was inadmissible to contradict unambiguous contract providing that no specific guaranty was given concerning water quality).

In *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332 (1982), we reversed a trial court for allowing testimony that one of the

contracting parties misrepresented itself during pre-contractual negotiations. Creamer involved a partial settlement to a lawsuit requiring the defendant to negotiate in good faith to resolve a remaining claim in exchange for the plaintiff's agreement to dismiss a separate fraud claim. Prior to reaching that agreement, the defendant "had repeatedly stated that any settlement would have to be in the range of $275,000 to $550,000." *Creamer,* 294 Md. at 111, 448 A.2d at 333–34 (footnote omitted). But after the settlement was reached, the defendant's best offer was $80,000. The plaintiff rejected the offer and sought to rescind the prior settlement in order to reinstate the fraud claim. The trial court concluded that while there was " 'no evidence of intentional misrepresentation' " by the law firm, the firm had made an " 'honest misrepresentation' " that induced the plaintiffs into believing that the settlement discussions would be in the range of $275,000 to $550,-000. *Creamer,* 294 Md. at 112, 448 A.2d at 334. The trial court hearing the plaintiff's claim for rescission therefore rescinded the agreement, allowing the fraud claim to be reinstated. In reversing the trial court's decision to allow rescission, we stated:

> "It is true that an unintentional 'material misrepresentation of fact . . . may warrant rescission by a Court of equity of a contract induced thereby.' However, the trial court overlooked an important principle made clear by the cases regarding rescission for misrepresentation absent fraud or other intentional culpable conduct. That is, in order to be a ground for rescission, *the alleged innocent misrepresentation inducing the signing of the contract may not vary or contradict an express term of the written instrument.*
>
> \* \* \*
>
> *The parol evidence rule precludes the granting of relief for unintentional representations preceding the contract which conflict with the terms of the contract."* (Emphasis added) (citations omitted).

*Creamer,* 294 Md. at 116–18, 448 A.2d at 337 (quoting *Shulton, Inc. v. Rubin,* 239 Md. 669, 686, 212 A.2d 476, 486 (1965).)

In *Attman/Glazer, supra,* a state agency had a long-term lease for property owned by Attman. Anticipating that the agency may choose to exercise its right to condemn the property during the term of the lease, the parties agreed on a lease provision providing for valuation of the property based on the average of three appraisals of the lessor's interest in the property. The lessor argued that the valuation provision was ambiguous as to whether the appraisals should ascertain the property's value as a fee simple absolute or as a fee simple subject to the state agency's leasehold estate. Turning to basic principles of property law, we held that the contract was unambiguous in requiring that the valuation should be based on the lessor's interest during the term of the lease. *Attman/Glazer,* 323 Md. at 605–06, 594 A.2d at 145. Since the lessor's interest was a reversionary interest, *i.e.,* subject to the state's leasehold interest, the trial court had properly "considered the language of . . . the lease objectively and concluded" that the appraisals were to be based on the lower value of the lessor's reversionary interest. *Attman/Glazer,* 323 Md. at 606, 594 A.2d at 145. Thus, we concluded that the trial court was correct in considering the text of the contract in light of the law of property, in refusing to admit extrinsic evidence, and in applying the clear text of the contract. *See also Gilchrist v. Chester,* 307 Md. 422, 425–26, 514 A.2d 483, 484–85 (1986)(holding that deed was unambiguous in conferring fee simple subject only to an easement, that description of parcel as a "school/park" did not restrict conveyance, and that parol testimony as to the contents of the deed was improperly admitted).

### III.

#### A.

In the instant case, parol evidence was admitted solely for the purpose of determining the numeric denominator by which the total release figure of $752,100 was to be divided in order to arrive at the amount that must be paid for a particular encumbered parcel to be released from the mort-

gage. The express language of the partial release provision calls for the denominator to be determined by "the total number of ... lots." Other language in this provision establishes what counts as a "lot." In arguing for ambiguity, Woods does not assert that the language expressly stating that the denominator will be calculated based on the number of lots is ambiguous; rather, she asserts that the other language is ambiguous in terms of how to properly compute the number of lots that are added together for use as the denominator.[6] Indeed, Woods' brief to this court quite succinctly concedes that:

> "The release provisions, instead of establishing a fixed release price for each lot, establish a formula to set the release fee by division of the amount of $752,100.00 *divided by the total number of subdivided residential building lots* in a subdivision plat of the mortgaged premises." (Emphasis added)(footnote omitted).

Thus, Woods does not dispute that the denominator by which the total mortgage is to be divided is a number of "lots."

Woods' interpretation, however, does not resolve the ambiguities she alleges. The proposed interpretation takes unambiguous language calling for a denominator based on "the total number of ... lots" and replaces it with a denominator based on acreage, thereby contradicting what she concedes is the express language of the contract. Moreover, she concedes that the written contract does *not* "establish[ ] a fixed release price for each lot," but she contradicts this concession by proposing a fixed price for each lot based on its acreage. Finally, while the phrase "from time to time" appears vague superficially, the phrase more plausibly addresses the parties' belief at the time of contracting that not all the residential plats may be recorded simultaneously, but that they may be recorded as the property is developed, and the partial release fee would change accordingly. Regardless, the record does not reflect any dispute over the timing by which the number of

---

6. The alleged ambiguity is in the terms "subdivided lots," "from time to time," and "recorded subdivision plat."

lots should be measured for purposes of determining the release amount; therefore, any ambiguity in the phrase "from time to time" cannot justify avoiding application of the express terms through an analysis of the parties' intent. As a result, even if we were to agree that the language alleged by Woods was ambiguous, we would have to reverse because there is no nexus between the alleged ambiguities, the contract language necessary to resolve this dispute, and the alternative interpretation of the partial release provision that Woods proposes.

The exception to the parol evidence rule allowing extrinsic evidence to resolve ambiguous contractual language therefore is narrower than Woods contends and than the courts below held in this case. One may not argue ambiguity in one contractual term or clause in order to gain the admittance of extrinsic evidence to contradict other terms or clauses in the contract that are unambiguous. The extrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language in the contract. *Cf. State Highway*, 351 Md. at 239, 717 A.2d at 949 ("[T]he provision that the courts below found to be ambiguous is not controlling, and the provision that is controlling is not ambiguous."); *Housing Auth. of College Pk. v. Macro*, 275 Md. 281, 284–85, 340 A.2d 216, 218 (1975)(holding that extrinsic evidence cannot be introduced to show that the parties' understanding was different than the written contract when it was conceded that the words were unambiguous). In this case, evidence of prior negotiations, including that six months prior to the signing of the mortgage, the parties discussed a release provision with a denominator based on square footage, fails to resolve any of the ambiguities alleged by Woods and, therefore, should not have been admitted.

Woods' interpretation also would render unnecessary and superfluous a significant portion of the release language in the contract. Where possible, courts should avoid interpreting contracts so as to nullify their express terms. In *State Highway*, we examined a much more complex contract relating to the construction and material costs of a major highway

contract. The proposed "ambiguous" interpretation would have rendered the contractual language "as directed by the Engineer" redundant and thus superfluous. We rejected that interpretation, stating the general rule that "this Court will ordinarily avoid interpreting contracts in a way that renders its provisions superfluous." *State Highway,* 351 Md. at 237, 717 A.2d at 948. *See also Bausch & Lomb v. Utica Mutual,* 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993). The interpretation proposed by Woods in this case would render unnecessary, and in fact contradict, a larger and seemingly more significant phrase than the phrase in *State Highway, supra.* Her interpretation would render meaningless the entire phrase "by the total number of subdivided residential building lots in a recorded subdivision plat of the mortgaged premises, from time to time." We cannot accept an interpretation that would nullify the entire preceding quoted phrase to substitute it with a contradictory formulation.

On the other hand, if, as Woods contends and the trial court found, the contracting parties' intent was really to divide the mortgage *pro rata* based on the acreage, we do not believe that any problems of draftsmanship would have prevented those intentions from being explicitly spelled out. Indeed, it seems readily apparent that language calling for the mortgage to be allocated to the property on a *pro rata* basis (*i.e.,* based on the ratio of the size of the parcel for which a partial release is sought to the size of the total encumbered property) would have been substantially simpler to write than the language that was actually used in the contract, which includes no indication that a *pro rata* release was intended. Furthermore, as noted in footnote 3, *supra,* the partial release provision was written especially for this particular mortgage contract and did not make use of boilerplate language like much of the contract. One may safely assume that since the parties took the time to draft the more complicated per lot release rather than drafting a simpler *pro rata* release, the per lot release is what they probably intended.

## B.

Our prior decisions applying the parol evidence rule to exclude the admission of extrinsic evidence, *see supra* Part II. C, make application of the rule to this case quite clear. The instant case, for example, is not complicated by the need to turn to legal principles external to the contract for interpretative purposes since the question raised here is answered in the contract language. Thus, this case is more easily resolved in favor of excluding extrinsic evidence than *Attman/Glazer, supra,* where we had to turn to the law of property in order to determine the appropriate property interest referred to in the contract.

Furthermore, the letter showing that the parties discussed establishing the partial release based on square footage was written more than six months *prior* to the date the mortgage was finally signed. The method of calculating the release could have changed innumerable times over the six months before settlement, and there was testimony that the release provision was subject to extensive negotiations and changed on a daily basis up until the time of settlement. In *Jenkins, supra,* we held that the evidence should not have been admitted when there were communications between the contracting parties *subsequent* to entering the agreement that supported Jenkins' argument that the note was not payable on demand. Because the communications in *Jenkins* were subsequent to the finalization of the contract, the policy reasons for excluding the evidence by applying the parol evidence rule were considerably weaker than in the instant case. *A fortiori,* in the instant case, where no evidence was presented that *subsequent* to entering the mortgage contract the parties considered the release provision as being based on a *pro rata* basis, failure to exclude the extrinsic evidence would completely subvert the policy goal of resolving potential disputes with a contract by allowing evidence of pre-contractual negotiations to vary the terms of a final written contract.

Finally, the fact that this case involves a real property transaction provides even stronger reason for restricting the

use of extrinsic evidence to vary the written contractual terms.
In *Pumphrey v. Kehoe,* 261 Md. 496, 276 A.2d 194 (1971), we
applied the parol evidence rule in the similar context of a
contract for the sale of land. In that case, Carolyn Pumphrey
had contracted to sell a piece of property to Daniel Tessitore,
who in turn contracted to sell the property to a limited
partnership, of which Daniel Kehoe was a limited partner.
The sale price of the Pumphrey/Tessitore contract depended
on the success of a request for a rezoning permit—$12,600 if
the rezoning request was successful, and $6,000 if unsuccess-
ful. The Tessitore/Kehoe contract, which was also entered
into before an ultimate resolution of the rezoning application,
was for the "[t]otal price" of $8,500 and included an inte-
gration clause. After the rezoning effort was successful,
Pumphrey filed suit for the additional $6,600. At trial, the
dispute centered on whether Tessitore or Kehoe was liable to
Pumphrey for the additional $6,600 due. In his effort to shift
liability to Kehoe, Tessitore sought to introduce evidence of
conversations that took place prior to the execution of the
contract, which suggested that Kehoe had assumed liability for
the $6,600 owed to Pumphrey if the rezoning application was
successful. The circuit court refused to admit the oral evi-
dence.

On appeal, we affirmed the circuit court's refusal to admit
the parol evidence that Kehoe had assumed liability for the
$6,600. We stated that:

"*A rigid enforcement of the parol evidence rule should
occur in cases involving the sale of an interest in land in
which the Statute of Frauds ... requires that the contract
be evidenced by a writing, signed by the party to be
charged, in order to be enforced.* [In our opinion t]he
alleged oral contract ... would vary, alter or contradict the
provisions of the written contract. * * * As we have
observed, the written contract ... contains no language
which specifically assumes any alleged obligation under the
prior contract ... between Mr. Tessitore and the plaintiffs.
* * * [The] contract states that *'the total price'* (Emphasis
supplied.) of the subject property is $8,500.00 which the

purchasers agreed to pay in 'cash at the date of conveyance.' No other consideration is mentioned. The language is clear and unambiguous." (Emphasis added; citations omitted). *Pumphrey*, 261 Md. at 504–05, 276 A.2d at 199. *See also Markoff v. Kreiner*, 180 Md. 150, 158, 23 A.2d 19, 25 (1941)("When a contract is required by the Statute of Frauds to be in writing, an agreement modifying its provisions cannot be proved by parol."). Like the contract for the sale of land in *Pumphrey*, the mortgage contract in the instant case falls within the Statute of Frauds, *see* Maryland Code (1974, 1996 Repl.Vol.), Real Property Article, § 5–103, and strict enforcement of the Statute of Frauds should apply to prevent the admission of parol evidence inconsistent with the terms of the contract.

## C.

■■■ It is a fundamental principle of contract law that it is "improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships." *Canaras v. Lift Truck Services*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974). Contracts play a critical role in allocating the risks and benefits of our economy, and courts generally should not disturb an unambiguous allocation of those risks in order to avoid adverse consequences for one party. In the absence of fraud, duress, mistake, or some countervailing public policy, courts should enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement. Thus, as noted above, the court has no choice but "to presume that the parties meant what they expressed," and it may not look to "what the parties thought that the agreement meant or intended it to mean." *General Motors Acceptance*, 303 Md. at 261, 492 A.2d at 1310.

■■■ The trial court's ruling in the instant case appears to have overlooked these principles in its desire to arrive at a "fair" result. In adopting the *pro rata* partial release proposed by Woods, the trial court emphasized that such a

construction of the partial release provision constitutes the "only fair and equitable result" and that the "contract construction advocated by [the mortgagee] would result in an unfair and unreasonable result as it would require Ms. Woods to pay a release fee equal to the entire mortgage amount.... "

■ A trial court may properly consider the apparent fairness of a given result when contract language is susceptible of two different interpretations, one of which leads to a reasonable result and the other to an unreasonable result. " 'Where language of a contract is open to an interpretation which is reasonable and in accordance with the general purpose of the parties, the hardship of a different interpretation is strong ground for belief that such a meaning was not intended.' " *Canaras*, 272 Md. at 357, 322 A.2d at 877 (quoting *Sorensen v. J.H. Lawrence Co.*, 197 Md. 331, 339, 79 A.2d 382, 386 (1951)). But where, as here, one interpretation is consistent with the express language of the contract and the other interpretation contradicts that language, and thus the language of the contract is not open to interpretation, the reasonableness of result is an improper consideration for the trial court.

Furthermore, the fact that the cost of a partial release may differ substantially depending on the number of recorded residential lots on the encumbered property is anticipated from the express release language. Indeed, as Judge Kenney noted in his dissent from the Court of Special Appeals' decision, there may be very practical purposes for drafting the release provision on a per lot basis:

"Under this approach, the mortgage preserves the mortgagee's security for the outstanding debt while permitting the mortgagor an orderly subdivision and development process. In addition, as the mortgage holder, the mortgagee would be required to execute any plats to be recorded and thereby participate indirectly in the subdivision process. This participation presents to the mortgagee an opportunity to monitor the subdivision process and weigh the resulting impact of such things as any proposed public and private

rights-of-way, easements, and possibly reservations of open space, or any other dedications or approval requirements affecting the security and its future subdivision potential."

The language of the partial release, though perhaps not a model of clarity, unambiguously effectuates this purpose.

## IV.

The interpretation of a written contract is legal question subject to *de novo* review by the appellate courts. Whether a contract's clear terms resolve a particular ambiguity requires an objective analysis of the contract language considering the respective positions of the contracting parties. A party wishing to introduce extrinsic evidence to show the intent of the contracting parties must propose a plausible interpretation that resolves the specific alleged ambiguities in the contract. The partial release provision at issue in this case states that the amount that must be paid for a partial release from the mortgage is based on a number of residential lots in the mortgaged property at the time the release is sought, *i.e.,* "from time to time." The language is unambiguous. Moreover, even if the language were ambiguous, parol evidence would be admissible only to resolve the ambiguities and not to contradict unambiguous terms of the contract. The trial court therefore erred by attempting to ascertain the contracting parties' intent with the use of parol evidence and by not applying the express terms of the partial release provision.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. RESPONDENT TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**