**In re Ronald EAGLESTON, Debtor.**

**Health and Welfare Plan for Employees of Southern Maryland Electric Cooperative, Inc., et al., Plaintiffs,**

v.

**Ronald Eagleston, Defendant.**

**Bankruptcy No. 98–10978–DK.**
**Adversary No. 98–1270–DK.**

United States Bankruptcy Court,
D. Maryland,
at Greenbelt.

July 15, 1999.

David A. Wanger, Upper Marlboro, MD, for defendant.

Jeana Littrell, Los Angeles, CA, Michael J. Murphy, for plaintiffs.

Gary A. Rosen, Rockville, MD, trustee.

### MEMORANDUM OF DECISION

DUNCAN W. KEIR, Bankruptcy Judge.

Before the court are cross-motions for summary judgment on the non-dischargeability complaint filed in this adversary proceeding, as well as the oppositions and rebuttals thereto. A hearing was held on January 7, 1999 and the parties were permitted to file supplemental memoranda. After careful consideration of all the arguments before it, the court finds that Plaintiffs' motion for summary judgment must be denied and Defendant will be granted summary judgment on all counts of the adversary proceeding.

Defendant/Debtor is Ronald T. Eagleston ("Eagleston"), an attorney licensed to practice in the State of Maryland. Plaintiffs are the Health and Welfare Plan for the Employees of Southern Maryland Electric Cooperative, Inc. (the "Plan") and Sharon McWilliams, the Plan administrator. The events leading to this adversary proceeding began in late 1994 when one of Eagleston's clients, Ms. Queen, was injured in an automobile accident. Ms. Queen, who was a beneficiary of the Plan, received benefits paid from the Plan. Thereafter, Ms. Queen sought the legal assistance of Eagleston, who filed a claim with Ms. Queen's insurance company ("Insurance Company"), pursuant to the uninsured motorist policy. Upon receipt of a $25,000 payment from the Insurance Company (the "Settlement Funds"), Eagleston distributed the proceeds to his client.[1]

---

1. Plaintiffs' complaint contains numerous allegations of intent, notice and knowledge,

The Plan asserts that it held an interest in the Settlement Funds.

In 1997, the Plaintiffs initiated a lawsuit in the United States District Court for the District of Maryland (the "District Court") to recover the Settlement Funds paid to Ms. Queen on behalf of her injuries. The Defendants in that case were Ms. Queen, Eagleston and Eagleston's Professional Corporation. Plaintiffs settled their claim against Ms. Queen. On the day prior to the summary judgment hearing before the District Court, Eagleston filed this bankruptcy case, thus invoking the automatic stay protections of 11 U.S.C. § 362(a)[2]. Because the action against Eagleston was stayed and the Plaintiffs reached a settlement with Ms. Queen, the District Court case went forward only as against Eagleston's Professional Corporation. Judgment was entered in favor of the Plaintiffs.[3]

Plaintiffs brought this adversary proceeding seeking an order that the alleged debt owed by Eagleston to Plaintiffs is non-dischargeable. Plaintiffs proceed under two theories of non-dischargeability. First, it is argued that the debt is non-dischargeable pursuant to Section 523(a)(4), as being a debt incurred by embezzlement, larceny, or fraud or defalcation committed by someone acting in a fiduciary capacity. Second, Plaintiffs aver that the debt is non-dischargeable under Section 523(a)(6) because it was incurred by a "willful and malicious" injury.

Eagleston contests both the existence of the debt as well as its non-dischargeability. Both parties have filed motions for summary judgment requesting a disposition of the entire adversary proceeding.

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to bankruptcy cases by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883–84, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Sylvia Dev. Corp. v. Calvert County, Maryland,* 48 F.3d 810, 817 (4th Cir.1995). In considering a motion for summary judgment the court must view all permissible inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992). Summary judgment is appropriate only if, taking the record as a whole, a reasonable jury could not possibly return a verdict in favor of the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ As a preliminary issue, the court takes up the parties' arguments regarding the preclusive effect of the proceedings before the District Court. Principles of res judicata and collateral estoppel exist to prevent the relitigation of claims or issues previously adjudicated. In particular, res judicata, also referred to as "claim preclusion," binds the parties to a lawsuit and those in privity, to the final judgment of a court as to any matter which was actually raised or that could have been raised in support of that claim. Alternatively, collateral estoppel, or "issue preclusion" as it is known, acts as a bar to only those issues that were raised and actually litigated and constituted necessary findings to the litigation. WRIGHT, MILLER & COOPER, FEDERAL

---

which the court leaves for discussion in a later portion of this opinion.

**2.** Hereafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

**3.** The court assumes that the judgment has not been paid, or there would be no need for this adversary proceeding.

PRACTICE AND PROCEDURE: Jurisdiction § 4402 (1981).

■ Res judicata cannot form the basis for a decision of nondischargeability as held by the United States Supreme Court in its decision of *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). The Court explained that the application of res judicata to nondischargeability proceedings was impracticable for two reasons. First, the Court recognized that during the former litigation, the bankruptcy would, in most cases, be merely a "hypothetical" and therefore, the parties would not have reason to advance arguments of nondischargeability. *Id.* at 134–35, 99 S.Ct. at 2211. Second, the Court suggested that it was Congress's intent to confer jurisdiction over nondischargeability to the federal bankruptcy courts, thus it was improper to place that discretion with another court. *Id.* at 135–36, 99 S.Ct. at 2211–12. However, in *Brown*, the Court did note that collateral estoppel may apply in nondischargeability proceedings. The court reasoned that:

> Whereas res judicata forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit.... If in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of § 17, then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in bankruptcy court.

*Id.* at 139 n. 10, 99 S.Ct. at 2213, n. 10 (citations omitted). See also *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that collateral estoppel applies in non-dischargeability actions).

■ The application of collateral estoppel is appropriate only "if the examination of the record of the earlier proceeding satisfied the bankruptcy court that the issue was raised and litigated and that the resolution of the issue was necessary to the verdict in the prior case." *Combs v. Richardson*, 838 F.2d 112, 114 (4th Cir. 1988).

■ Plaintiffs maintain that their entire case can be established by collateral estoppel. They argue that collateral estoppel should bar Eagleston from litigating the existence of the debt owed to Plaintiffs as well as each and every necessary element of the non-dischargeability causes of action. Eagleston replies by arguing that his bankruptcy filing and invocation of the automatic stay prevent any application of collateral estoppel in this case.

The unique circumstance in the instant proceeding is that the District Court adjudication occurred after the petition in bankruptcy was filed and while the automatic stay imposed by Section 362(a)(1) protected Eagleston from the continuation of that litigation. The court is disturbed by the notion that collateral estoppel might be applied to circumvent the protections intended and created by the automatic stay upon the filing of bankruptcy. What the Plaintiffs seek is to have this court find that because the District Court action proceeded against Eagleston's Professional Corporation, Eagleston should be estopped from presenting defenses in this adversary proceeding.

The automatic stay prevents the "commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was ... commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title...." 11 U.S.C. § 362(a)(1).

This absolute and broad stay imposed by the Bankruptcy Code is a clear and unequivocal congressional mandate that provides a debtor a respite from defending himself so as to have a meaningful opportunity for a fresh start. The legislative history of Section 362 reveals Congress's intent to provide such protection for debtors. "The automatic stay is one of the

fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors.... It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." S.REP. No. 95–989, at 54–55 (1978), *reprinted* in 1978 U.S.C.C.A.N. 5787, 5840–41; H.R.REP. No. 95–595, at 340 (1978), *reprinted* in 1978 U.S.C.C.A.N. 5963, 6296–97. That unequivocal enactment would be subverted and indeed overturned if the debtor was held subject to results of a trial that went forward after the bankruptcy was filed, but before the automatic stay had been modified. It is immaterial that Eagleston may have been physically present in the District Court in his capacity of legal representative of another entity—he cannot be forced into defending a cause of action that is subject to the automatic stay merely out of fear that he may be subject to issue preclusion if he opts to stand on his statutorily created rights. As stated by one court: "Since [the debtor] cannot be compelled to appear in nonbankruptcy court to defend his creditor's or guarantor's claim, absent relief from the automatic stay, principles of law, which might otherwise bind the debtor, are of no effect in a bankruptcy context." *Plessey Precision Metals, Inc. v. The Metal Center, Inc. (In re Metal Center)*, 31 B.R. 458, 463 (Bankr. D.Conn.1983) (holding that one reason for declining to extend the automatic stay to the non-debtor co-obligee would be because the result of a state court action against the non-debtor would not be binding on the debtor).[4]

▮▮▮▮ Plaintiffs would not be entitled to summary judgment even if the court applied collateral estoppel. The elements of intent bearing on non-dischargeability pursuant to Section 523(a)(4) and (6) were neither litigated in the District Court nor necessarily decided. A successful cause of action pursuant to Section 523(a)(6) requires the plaintiffs to prove that the debt arose from willful harm done with the intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Defalcation and embezzlement under Section 523(a)(4) also require the existence of some wrongful conduct.[5] In the District Court, the determination of liability as to Eagleston's Professional Corporation did not require the District Court to make findings on these necessary elements of non-dischargeability.

Eagleston disputes, both in response to Plaintiffs' motion and in defense of his own, that Plaintiffs are even owed money, let alone that they are the holders of a non-dischargeable debt. Eagleston further argues that the undisputed facts, viewed in the light most favorable to Plaintiffs, do not support a finding of a fiduciary relationship as intended by Section 523(a)(4) or a finding of defalcation, embezzlement, or willful and malicious injury.

---

4. The United States Court of Appeals for the Fourth Circuit discussed the *Metal Center* opinion in some detail in its opinion of *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.1986). While true that in reaching its decision the Court of Appeals indicated that it might not agree with the bankruptcy court's decision in *Metal Center*, the holding was on an entirely different issue than in the instant case and therefore offers little guidance. The issue at hand in the *Piccinin* case was whether the bankruptcy court should have extended the extraordinary relief of the automatic stay to a non-debtor. The Court of Appeals mentioned collateral estoppel in its discussion, however, the determination of whether collateral estoppel would exist was not in issue.

5. *See Matter of Schwager*, 121 F.3d 177 (5th Cir.1997) ("While defalcation may not require actual intent, it does require some level of mental culpability.") (citing *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir.1937)).

In order for a debt to be held non-dischargeable under the embezzlement prong of Section 523(a)(4), the court must find that the debtor has appropriated property both for the debtor's benefit and with fraudulent intent or by deceit. *Caldwell v. Hanes (In re Hanes)*, 214 B.R. 786, 822 (Bankr.E.D.Va.1997).

Because the court finds that issue preclusion does not apply, it will address parties' arguments on summary judgment.

■ The court first addresses Eagleston's contention that the Plaintiffs are owed no debt by Eagleston. He reasons that the Plaintiffs were never entitled to reimbursement from the Settlement Funds in the first place and therefore Eagleston cannot be held liable for the non-turnover of the Settlement Funds. In support of that assertion, Eagleston cites to the subrogation and right to recovery clause in the contract between Ms. Queen and the Plan that provides for payments by third parties for injury by third parties. The applicable language reads:

A Third Party may have to pay benefits to you or your covered Dependents. If the covered person has received benefits under this Plan for an Illness, a sickness, or a bodily injury caused by the third party, then [the Plan] may, at its sole option:

Take over the covered person's right to receive payment of the benefits from the third party. In this case, the covered person will also transfer to [the Plan] any rights he may have to take legal action against the third party;

Recover from the covered person any payment for the benefits the covered person receives from the third party;

Reduce the benefits payable under this Plan by payment for the benefits that the covered person has received from a third party; and

Require the covered person to provide all information and sign and return all documents necessary to carry out [the Plan's] rights under this provision, before any benefits are paid under this Plan.

For example, if you were injured while traveling in a car and the auto insurance covered your medical expenses, or if you were injured inside someone's house and the homeowner's insurance covered your medical expenses, the Plan is not required to make payments on claims arising from these injuries to the extent that they are or may be paid by a third party.

Exhibit 4 to Plaintiffs' Motion for Summary Judgment (titled Provision For Subrogation And Right Of Recovery).

Eagleston maintains that the third-party language in the Plan requires the beneficiary of the Plan to reimburse the Plan only for payments received from the tortfeasor or the tortfeasor's insurance company. As Ms. Queen's Insurance Company was not related in any way to the tortfeasor, Eagleston concludes that Ms. Queen was not responsible for reimbursing the Plan for the Settlement Funds received from her own insurer.

Plaintiffs urge the court to read the subrogation section of the Plan "as a whole." According to Plaintiffs, such a reading would evidence the requirement that the Plan beneficiary relinquish all entitlement to recover monies from any third party, to the extent of benefits paid by the Plan. As to the exact nature of their interest in the Settlement Funds, Plaintiffs present two theories—lien and constructive trust.

■ Plaintiffs' first argument is that the Plan held a lien on the Settlement Funds. Plaintiffs have raised this issue in both their pleadings and in oral argument, citing two grounds for this conclusion. In argument at the summary judgment hearing, Plaintiffs declared that a lien arose out of the federal ERISA statutes. When asked for a supporting citation during oral argument, counsel for Plaintiffs was unable to provide one and did not do so subsequently despite being given an opportunity to do so by post-hearing memorandum.

Plaintiffs also contend that a lien arises out of Maryland law because the Plan identified the specific property from which the reimbursement obligation must be satisfied. The court notes that no Maryland statute exists whereby a private health

care insurer obtains a lien on funds received by the beneficiary from third parties. The State of Maryland clearly knows how to create such a law, as it has done so for hospitals and certain state supported plans in analogous contexts. *See* MD.CODE ANN., COM.LAW II § 16–601 (1991); MD. CODE ANN., HEALTH-GEN I § 15–120 (1997).

No such rights arise out of common law. As the Court of Appeals of Maryland remarked in *Government Employees Ins. Co. v. Group Hospitalization Med. Svcs., Inc.*, 322 Md. 645, 589 A.2d 464 (1991):

> [Plaintiff], perhaps inspired in part by the language of its own letter informing [Defendant] that its "present total lien is $21,474.72," and encouraged by [Defendant's] internal memorandum characterizing [Plaintiff's] communication as a "lien letter," claims a lien upon funds in the hands of [Defendants]. [Plaintiff] offers no authority for the contention that a subrogee acquires a lien when it obtains its subrogation rights, and we know of none.

*Id.* at 649, 589 A.2d at 466. *See also Pepper v. Johns Hopkins Hosp.*, 111 Md. App. 49, 63 n. 7, 680 A.2d 532, 539 (1996).

The court has read the argument put forth by the Plaintiffs and the cases cited in support thereof, but Plaintiffs have advanced no meritorious legal basis for the assertion of a lien in the Settlement Funds.

■ Second, Plaintiffs would have the court impose upon the Settlement Funds a constructive trust.[6] A constructive trust has been defined by the Maryland Court of Appeals as "the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property." *Wimmer v. Wimmer*, 287 Md. 663, 414 A.2d 1254 (1980).

■ In order for the court to find the existence of a constructive trust, it would have to first find that the Plan was entitled to reimbursement of the Settlement Funds from Ms. Queen. The court does not so find.

■ The subrogation and right to reimbursement clause must be evaluated using common law principles of contract law. *See, e.g., Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 785 (1995); *Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). In Maryland, as in federal common law,[7] it is well established that an insurance contract is to be evaluated as a whole, but is not to be construed against the insurer unless the policy language is determined to be ambiguous. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617, 619 (1995); *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766–67, 556 A.2d 1135, 1138 (1989). Accordingly, the court must first determine whether the contract is ambiguous.

■ In Maryland, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomir-*

---

6. The District Court, in its Order, held that the Settlement Funds were held in constructive trust by Eagleston's Professional Corporation.

7. Caselaw within the Fourth Circuit holds that if the Plan was subject to the federal ERISA laws, this court would be required to construe the contract by applying principals of federal common law. *See, e.g., Hardester v. Lincoln Nat'l Life Ins. Co.*, 33 F.3d 330, 334 (4th Cir.1994).

Although, Plaintiffs have not sufficiently documented that the Plan is an ERISA plan, the court does note that contained in Exhibit 11 to Plaintiffs' Motion for Summary Judgment is a letter by United States Magistrate Judge Day stating that the ERISA laws apply to the Plan. Nevertheless, the reference in this opinion to Maryland common law as opposed to federal common law does not affect the outcome of this case. The United States Court of Appeals for the Fourth Circuit has also held that a contract is to be given its plain meaning unless its terms are ambiguous. *See id.*

*is v. Woods,* 353 Md. 425, 436, 727 A.2d 358, 363 (1999). "The determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.' " *Id.* (quoting *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985)).

Plaintiffs would have this court ascribe a different meaning to the words "the third party" in each paragraph. Plaintiffs cite the court to the decision in *Harmond v. Teamsters Joint Council No. 83 of Virginia Health and Welfare Fund,* 795 F.Supp. 783 (E.D.Va.1992). The *Harmond* case is analogous to the instant case in that the court was asked to resolve the question of whether a health plan was entitled to be subrogated to the rights of its beneficiary as against the beneficiary's uninsured motorist coverage. Although Plaintiffs refer to *Harmond* for the proposition that courts should defer to the Plan administrator in matters of Plan interpretation, that court enforced the precise language of the health plan before it. The plan at issue provided a right of subrogation "against any person, firm, corporation, or other entity as respects such injuries, expenses, or loss." As discussed above, the Plan in the instant action contains materially different language.[8]

In the instant case, it is the meaning of the phrase "Recover from the covered person any payment for the benefits the covered person receives from the third party." that is at issue. Plaintiffs would urge the court to read the Plan to encompass payments received from any or all third parties. Eagleston insists that the term re-

fers only to the third party tortfeasor. The court must decide whether the language is truly susceptible to more than one meaning. Are both parties' interpretations reasonable? The court does not find that the Plan is ambiguous.

In the applicable section of the Plan, the first sentence alerts the insured that it is possible that she may receive benefits from third parties. The second sentence defines the circumstances which are necessary to trigger rights by the Plan. "If the covered person has received benefits under this Plan for an Illness, a sickness, or a bodily injury caused by *the* third party, [the Plan] may, at its sole option: ...." Exhibit 4 to Plaintiffs' Motion for Summary Judgment (titled Provision For Subrogation And Right Of Recovery) (emphasis added). The following paragraphs set forth the four rights of the Plan upon the occurrence of the trigger event. The only right to recover monies from the Plan beneficiary is set forth in the third paragraph of the section: "Recover from the covered person any payment for the benefits the covered person receives from *the* third party...." *Id.* (emphasis added). "[T]he third party" clearly refers to the tortfeasor referenced in the first paragraph and thus the recovery right refers solely to benefits received by the insured from "the third party." Plaintiffs' more expansive interpretation is not supported by the document itself and the court declines to adopt such a theory.

■ Being that the contract is unambiguous,[9] the court must resolve the meaning of the contract as a matter of law. *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 389, 488 A.2d 486, 489 (1985).

---

8. Plaintiffs also urge the court to consider a public policy argument. It is suggested that to give broad meaning to the term "the third party" would prevent duplicative recoveries and reduce the prices of insurance coverage for all persons, thus allowing people to obtain more coverage. While the court has considered this argument, it is constrained to interpret the Plan only in accordance with the Plan's language. The Plan's rights cannot be

expanded beyond the contract terms based on this public policy argument.

9. The Plaintiffs would not be in a better position had the court found the language of the Plan ambiguous. The court would then have construed the language against the Plan, as the drafter of the contract.

As stated above, the Plan, by its own terms, is limited to rights of recovery from third party tortfeasors. The parties are presumed to have intended what they expressed in the language of the agreement and despite the urging of the Plaintiffs herein, their subjective intent now asserted is not considered. *Calomiris*, 353 Md. at 436, 727 A.2d at 363.

The court having examined all portions of the contract in evidence concludes that the Plan does not provide for an agreement by Ms. Queen to pay the Settlement Funds over to the Plan.[10] The contractual right to reimbursement created by the Plan arises only when the Plan beneficiary is injured by a third party and the payment received is from that third party or an insurer which insured the tortfeasor and pays on account of that third party tortfeasor. Ms. Queen, as Plan beneficiary, was not paid by the third party tortfeasor, or an insurance company acting on that person's behalf. Payments came from benefits under a contract between Ms. Queen and her uninsured motorist insurance. Therefore, the payments were not received from the third party which caused the injury and are not encompassed by the Plan's contractual right to recover.

Because there was no right to reimbursement as between Ms. Queen and the Plan, there can be no constructive trust imposed on the funds.

Viewing the facts in the most favorable light to Plaintiffs, Plaintiffs have pled no facts which support any finding that Plaintiffs held any right to the Settlement funds. It follows as a matter of law that Eagleston can have no liability for failure to hold the funds. Without liability there is no debt to be discharged or found non-dischargeable in bankruptcy. Accordingly, summary judgment must be granted in favor of Eagleston on all counts of Plaintiffs' Complaint and Plaintiffs' motion for summary judgment must be denied[11].

An Order in conformity with this decision will be entered herewith.

---

10. It would appear that the parties appearing before the District Court failed to provide to the District Court an adequate characterization of the subrogation and right to reimbursement clause. Perhaps because the Plaintiffs' right to recovery of the Settlement Funds from Ms. Queen was not contested before the District Court by the existing defendant, the court was led to base its decision on an incorrect description of the actual language of the Plan.

11. As stated earlier in the opinion, even if the court were to have found Eagleston liable to Plaintiffs for a debt, summary judgment could not lie in favor of Plaintiffs because there exists material disputes of fact necessary to the court's decision on both of the theories of non-dischargeability.