NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0117n.06

No. 08-4399

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 22, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| GEORGE J. SAAD; NOUR MANAGEMENT, INC., an Ohio Corporation; DEACONESS RADIOLOGICAL SERVICES, INC.; DEACONESS EMERGENCY ROOM SERVICES, INC., an Ohio Corporation, <br><br> Plaintiffs-Appellants, <br><br> v. <br><br> GE HFS HOLDINGS, INC., formerly known as Heller Healthcare Finances, Inc., <br><br> Defendant-Appellee. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |

BEFORE: NORRIS, COOK, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

George Saad ("Saad" or "Dr. Saad"), Nour Management Company ("Nour"), Deaconess Radiological Services, Inc. ("DRS"), and Deaconess Emergency Room Services, Inc. ("DERS") (collectively, Nour, DRS, and DERS are referred to as "the plaintiff companies" and with Saad are referred to as "plaintiffs") appeal the district court's order granting GE HFS Holdings, Inc.'s ("GE HFS") first motion for summary judgment, arguing that there was a genuine issue of material fact as to whether GE HFS represented that it would fund plaintiffs $250,000 in post-petition financing. Plaintiffs also appeal the district court's order granting GE HFS's third motion for summary

judgment on the issue of attorneys' fees and costs. Because the admissible evidence demonstrates

GE HFS acted at all relevant times within its contractual rights as set forth in the clear and

unambiguous terms of the Loan Agreement and Emergency Stipulation Re Post-Petition Financing

(the "DIP Stipulation"), we affirm the district court's first summary judgment order.[1] In addition,

because the district court did not err in awarding GE HFS its reasonable attorneys' fees, which are

enforceable under Ohio law, we affirm its third summary judgment order.

I.

In its order on GE HFS's third motion for summary judgment, the district court accurately

set forth the facts of the case:

> After nearly six years of litigating this case in three suits, the parties are well
> acquainted with the facts. After Deaconess Hospital (the "hospital") filed for
> bankruptcy, Dr. Saad created a new Deaconess Hospital LLC ("Deaconess"), which
> entered into a loan agreement (the "Loan Agreement") with GE HFS so that
> Deaconess could purchase all of the hospital's assets. Deaconess, Pearlview Square
> Inc. ("Pearlview"), and Nour[] (collectively, Deaconess, Pearlview, and Nour are
> referred to as the "Debtor Companies") were provided a $3,000,000 revolving line
> of credit through a revolving credit note (the "Revolving Credit Note"), which was
> later increased to $4,500,000. The revolving credit line was secured by property
> owned by Pearlview and a personal guaranty by Dr. Saad of $750,000 (the "Personal
> Guaranty"). Over time, many amendments were made to the Loan Agreement as
> well as to the Personal Guaranty. On October 9, 2003, the parties executed an eighth
> amendment ("Amendment Eight") to the Loan Agreement, which made DRS and
> DERS borrowers under the Loan Agreement and gave GE HFS a security interest in
> their accounts and accounts receivable. (Doc. No. 67, Exhibit 9). At that time, Dr.
> Saad ratified and confirmed his previous Personal Guaranty with respect to
> Amendment Eight. Like previous versions of the Loan Agreement, this final version

---

[1]The DIP Stipulation was approved by the bankruptcy court on November 26, 2003, pursuant to the "Order Approving Emergency Stipulation Re Interim Post-Petition Financing" (the "DIP Order"). Collectively, the DIP Order and the DIP Stipulation are referred to as the "DIP Financing."

of the Loan Agreement contained an attorneys' fee provision. Specifically, the Loan Agreement provided that:

> Borrower also agrees to pay all out-of-pocket charges and expenses reasonably incurred by Lender (including the reasonable fees and expenses of Lender's counsel) in connection with the enforcement, protection or preservation of any right or claim of Lender, the termination of the Agreement, the termination of any liens of Lender on the Collateral, and the collection of any amounts due under the Loan Documents.

(Doc. No. 67, Exhibit 1). Similarly, the revolving credit note also provided that:

> Each party liable on this Note in any capacity, whether as maker, endorser, surety, guarantor or otherwise . . . (v) agrees to pay, in addition to all other sums of money due, all costs of collection and reasonable attorney's fees, whether suit be brought or not, if this Note is not paid in full when due, whether at the stated maturity or by acceleration.

(Doc. No. 67, Exhibit 15). Finally, the Personal Guaranty signed by Dr. Saad states:

> In addition to its guarantee of Borrower's payment of the Overline Obligations and Borrower's performance of all covenants, obligations, and agreements contained in the Loan Documents, Guarantor shall pay all actual costs and expenses (including reasonable attorney's fees) paid or incurred by Lender in connection with the enforcement of this Guaranty.

(Doc. No. 67, Exhibit 24).

Despite efforts by Dr. Saad, the hospital generated operating losses and the Debtor Companies filed for bankruptcy on November 21, 2003. After the bankruptcy petition was filed (the "Bankruptcy Cases"), the bankruptcy court signed an order (the "DIP Order") approving an emergency stipulation (the "DIP Stipulation") so that Deaconess could obtain an additional $250,000 from GE HFS to pay for the hospital's operating expenses, which was conditioned upon a re-commitment by Dr. Saad to personally guarantee the debt up to $1,000,000 (the "Revised Personal Guaranty"). Like the Loan Agreement, the DIP Stipulation also provided for attorneys' fees:

> The Borrowers shall reimburse GE, or GE may at its option may [sic] charge any account of the Borrowers maintained with GE, for all attorney's fees and/or costs incurred by GE in connection with these Chapter 11 cases, including, but not limited to, the negotiation, preparation, administration or enforcement of the Agreements and/or this Stipulation. Notwithstanding the foregoing, the allowance and payment of attorney's fees and costs is subject to Court approval.

(Doc. No. 67, Exhibit 26). The DIP Order reiterated the Borrowers' obligation for attorneys' fees to GE HFS:

> The Debtors are authorized to borrow and spend monies in accordance with the Agreements and are further authorized and directed to do and perform all acts, to make, execute, and deliver all instruments necessary for their performance, including, without limitation: . . . (c) [t]he reimbursement to GE of its reasonable costs and expenses including, without limitation, all of its attorney's fees and disbursements required by the terms of the Agreements and/or the Stipulation.

(Doc. No. 67, Exhibit 27). Despite the agreement, GE HFS did not provide the post-petition financing and the hospital was forced to cease operations on November 29, 2003.

On December 3, 2003, GE HFS declared Deaconess in default of its obligations and delivered a demand letter to Dr. Saad to pay the full amount of the Revised Personal Guaranty. On December 12, 2003, the [plaintiffs] filed suit in the Court of Common Pleas for Cuyahoga County, claiming that GE HFS had violated its obligations under the DIP Stipulation and DIP Order by not providing the additional $250,000 necessary to maintain the hospital's operations. The [plaintiffs] requested compensatory and punitive damages; attorneys' fees, interest and costs; and injunctive relief enjoining GE HFS from "any action to obtain possession of or otherwise sell or dispose of the [collateral] until Plaintiff's [sic] claims against GE are determined . . . ." The case was removed by GE HFS to federal court on December 12, 2003 (the "District Court Litigation"). (Doc. No. 1).

On June 9, 2004, the Debtor Plaintiffs filed an adversary proceeding ("Adversary Proceeding") with the bankruptcy court raising various breach of duty, lender liability, and equitable subordination claims against GE HFS. Although GE HFS

considered consolidating the Adversary Proceeding with the District Court Litigation, it chose to allow the suits against it to proceed separately.

On July 25, 2005, the bankruptcy court resolved GE HFS and the Debtors Companies' disagreement on the amount of indebtedness as of the petition date. The approved settlement term sheet (the "Settlement Agreement") stated:

> The GE Creditors assert a Secured Claim and an Administrative Claim against the Debtors' estates; and those Claims currently total more than $4,900,000.00. The [C]laims of the GE Creditors consist of: [a] the GE HFS Secured Claim balance as of October 1, 2004 (immediately before the $3,500,000.00 payment to GE HFS on October 1, 2004) in the amount of $4,298,548.42; (b) all charges (including, but not limited to, continuing interest accruals, legal fees, and costs) that GE HFS has incurred and asserts that it is entitled to recover as part of its Secured Claim from and after October 1, 2004; and (c) a GE Med Administrative Claim of at least $77,489[.]54 arising from the Debtors' post-petition use of equipment leased from GE [Med] under leases subsequently rejected by the Debtors. Subject to all of the provisions of the Settlement, including specifically, but without limitation, the accommodations that the GE Creditors are willing to make in lieu of positions that they would assert in litigation, the GE HFS Secured Claim will be allowed under the Settlement as a Secured Claim against the Debtors' estates in the amount of $4,250,000.00; and the GE Med Administrative Claim will be allowed under the Settlement as an Administrative Claim against the Debtors' estates in the amount of $77,489.54.

In sum, the Settlement Agreement states that GE HFS asserted three claims against the Debtor Companies: a secured claim, an unsecured claim for charges, and an administrative claim. These claims totaled more than $4.9 million, and the parties agreed that $4.25 million of that consisted of the secured claim. This secured claim, as GE HFS recognizes in its briefs, included most of its attorneys' fees through October 1, 2004. (Doc. No. 87). The bankruptcy court and the Settlement Agreement, however, distinguished between the $4.25 million secured claim against the Debtor Companies and any remaining unsecured claim against the [plaintiffs]. The settlement term sheet specifically provided that "[w]hile the GE Creditors covenant with the Debtors' estates not to seek further recovery from the Debtors' estates after GE HFS receives indefeasible payment of $3,850,000.00 . . . , the GE

Creditors reserve and do not release their claims against Dr. Saad and the non-debtor entities."

The Settlement Agreement recognized pre-petition payments of $3.85 million and provided that GE HFS would agree not to seek recovery of the remaining $400,000 (the "carve out") of the $4.25 million secured claim, because the carve out would be paid to estate professionals to satisfy GE HFS' obligations to Bank One, who provided the post-petition financing. GE HFS, however, did not agree that the carve out constituted a payment of the remaining indebtedness, and it declared the Plaintiff Companies in default of their obligations under the Settlement Agreement, delivering a demand letter to Dr. Saad to pay the full amount of the Revised Personal Guaranty. After the [plaintiffs] purportedly defaulted on their obligations under the DIP Stipulation and DIP Order, GE HFS filed a counterclaim on December 1, 2005 against the [plaintiffs] to seek recovery of debts still outstanding, namely, the $400,000 carve out and the attorneys' fees and costs incurred in defending itself in the various actions.

On September 21, 2006, this court granted GE HFS's first motion for summary judgment and dismissed the [plaintiffs'] complaint with prejudice. Specifically, the court found that "nothing in the DIP Stipulation, Amendment Eight, or the Loan Agreement indicate that GE had an obligation to immediately advance Plaintiffs $250,000.00." (Doc. No. 65). On November 11, 2006, GE HFS filed a second motion for summary judgment on its counterclaim, claiming that the Plaintiff Companies still owed GE HFS the $400,000 carve out and attorneys' fees and claiming that Dr. Saad was liable under the Revised Personal Guaranty. (Doc. No. 67). On August 16, 2007, the court determined, in response to this second motion, that GE HFS had been constructively paid the contested $400,000 carve out. The court determined that the $400,000 constructive payment fully satisfied the Debtor Companies' and Plaintiff Companies' obligations under the Loan Agreement and Settlement Agreement with regard to the $4,250,000 secured claim. Thus, the court found, that, with regard to the secured claim, "the Plaintiff Companies have no remaining obligations to GE." (Doc. No. 67).

The court, however, recognized the possibility that unsecured debt remained outstanding in the form of attorneys' fees and costs incurred by GE HFS in defending itself in the various actions. In the second motion for summary judgment, GE HFS also sought $961,388.10 in interest indebtedness, attorneys' fees, and costs from the Debtor Companies and claimed that Dr. Saad had personally guaranteed up to $1,000,000 of GE HFS' remaining claims. The court did not rule on this portion of

GE HFS' motion for summary judgment, but requested that the parties submit additional briefs on the issue of attorneys' fees.

On September 26, 2008, the district court granted GE HFS's third motion for summary judgment on the issue of attorneys' fees and costs. It awarded GE HFS $1,055,312.23 in attorneys' fees pursuant to Ohio Revised Code § 1301.21, as well as $30,145.90 in costs, for a total award of $1,085,458.13.

Plaintiffs timely appeal the district court's orders on GE HFS's first and third motions for summary judgment.

## II.

"We review de novo the district court's order[s] granting summary judgment." *Daugherty v. Sajar Plastics, Inc*., 544 F.3d 696, 702 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether the movant has met this burden, we must view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

## III.

First, plaintiffs assert that the district court erred in entering the first summary judgment order because there was a genuine issue of material fact regarding whether GE HFS represented that it

would advance $250,000 in post-petition financing. Moreover, plaintiffs contend that the Loan

Agreement and Amendment Eight thereto, as modified by the DIP Order and the DIP Stipulation,

are ambiguous as to whether the DRS and DERS accounts were "Qualified Accounts" as of

November 26, 2003. Because of this purported "ambiguity," plaintiffs argue that the district court

erred by excluding extrinsic evidence to interpret the terms of the documents. In addition, plaintiffs

assert that the district court should have considered extrinsic evidence of GE HFS's alleged promise

to advance $250,000 as evidence of fraudulent inducement.

A.

Plaintiffs' claim is predicated on the assumption that, upon signing the DIP Stipulation, they

were immediately entitled to the additional $250,000 of post-petition financing. However, nothing

in the DIP Stipulation or the DIP Order (or Loan Agreements incorporated therein) required GE HFS

to advance $250,000 to the Debtor Companies automatically upon entry of the DIP Order. Rather,

the DIP Stipulation states that "GE has agreed in good faith to *consider*[] providing additional

funding to the Initial Borrowers and provide funding to Indoga, subject to the terms set forth in the

[pre-petition Loan] Agreements as modified by the terms of this Stipulation." (Emphasis added.)

The only relevant modification of the pre-petition Loan Agreements with respect to financing was

to increase the amount available from $100,000.00 to $250,000.00. Otherwise, the DIP Stipulation

is clear that "all terms and conditions of the [pre-petition Loan] Agreements remain in full force and

effect." Moreover, under the express terms of the DIP Stipulation, the Debtor Companies were

required to comply with their obligations under the pre-petition Loan Agreements prior to securing a cash advancement.

Those obligations, with respect to DRS and DERS, are set forth in the original Loan Agreement and Amendment Eight to that Agreement. Pursuant to the original Loan Agreement, a Borrower is only entitled to borrow according to a specified Borrowing Base Formula, which factors in the Borrower's "Qualified Accounts." On October 9, 2003, when the parties executed Amendment Eight, they agreed and acknowledged that GE HFS:

> has not completed its due diligence of New Borrower [DRS and DERS], and therefore, the Accounts of New Borrower [DRS and DERS] shall not be deemed to be Qualified Accounts, and consequently, such Accounts shall not be included in the Borrowing Base, unless and until Lender has determined, in its sole and absolute discretion, to include New Borrower's [DRS and DERS] Accounts, or a portion thereof, in the Borrowing Base.

As noted by the district court, GE HFS was unable to determine whether the accounts of DRS and DERS constituted "Qualified Accounts" due to deficiencies in plaintiffs' Aging that were never explained or corrected.[2]

---

[2]The district court held, as a matter of law, that GE HFS was "well within its rights under the various agreements" to not approve post-petition financing because there was evidence to support a finding that DRS and DERS were not "Qualified Accounts." In pertinent part, the district court noted:

> Upon receiving the request for post-petition financing, GE Senior Vice President Richard Arrowsmith and Account Manager Rahm Dvir found several deficiencies in the Aging that accompanied the request: (1) the suspicious use of an Excel Spreadsheet that was created and presented by someone independent from the Accounts management system, (2) the abnormal migration of over $835,000 of accounts, which instead should have been collected and deposited into the lockbox account created under the Loan Agreement, and (3) the inclusion of Medicare and

Plaintiffs argue that the inclusion of language in the DIP Stipulation stating that GE HFS had not completed its due diligence with respect to the Indoga Accounts, and that they therefore were deemed not to be "Qualified Accounts," makes the operative documents ambiguous with respect to the status of the DRS and DERS accounts because the DIP Stipulation did not address those accounts. As plaintiffs note, however, Indoga was a "'New Borrower' added to the Loan Agreement by the DIP Stipulation." Because the status of the Indoga Accounts would not have been addressed in the original Loan Agreement or in Amendments One through Eight, it was necessary to address it in the DIP Stipulation. In contrast, DRS and DERS were already Borrowers under the Loan Agreements at the time of the DIP Stipulation; therefore, the status of their accounts was addressed previously by the parties in pre-petition loan documents, and there was no need to reference those accounts in either the DIP Stipulation or DIP Order. Accordingly, we find (1) no ambiguity in the Loan Agreement and Amendment Eight thereto, as modified by the DIP Order and the DIP Stipulation, and (2) no modification of the parties' agreements, which would have unconditionally required GE HFS to provide $250,000 in post-petition financing.

B.

Next, plaintiffs argue that the district court erred in not considering extrinsic evidence in the form of affidavits by Daniel DeMarco and Saad clarifying whether DRS and DERS were "Qualified Accounts" as of November 26, 2003. However, because the DIP Stipulation is unambiguous and

---

Medicaid Accounts for periods prior to the time when DRS and DERS had obtained Medicare/Medicaid provider agreements. (Arrowsmith Decl., at ¶ 49; Dvir Decl., at ¶ 14.) These deficiencies were never explained nor corrected despite requests from GE for further clarification.

has an integration clause, Ohio law[3] limits the district court's analysis to the four corners of the

agreement.[4] *See Astor v. Int'l Bus. Machs. Corp.*, 7 F.3d 533, 539 (6th Cir. 1993) ("The law in Ohio

concerning the effect to be given to a fully integrated agreement is clear: . . . *Intentions not*

*expressed in the writing are deemed to have no existence and may not be shown by parol evidence*.")

(internal quotation marks and citations omitted); *see also Layne v. Progressive Preferred Ins. Co.*,

820 N.E.2d 867, 869 (Ohio 2004) ("When two parties have made a contract and have expressed it

in a writing to which they have both assented as the complete and accurate integration of that

contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will

not be admitted for the purpose of varying or contradicting the writing.") (internal quotation marks

and citation omitted).  Accordingly, the district court correctly limited its analysis to the text of the

parties' agreements and properly excluded the parol evidence contained in DeMarco's and Saad's

affidavits.[5]

---

[3]The district court found that, although the underlying Loan Agreements are governed by Maryland law, the DIP Stipulation is governed by Ohio law.  The parties do not appear to dispute this finding as both parties cite Ohio law in their discussions of the DIP Stipulation and DIP Order. Regardless, the law on contract interpretation is the same in Ohio and Maryland:  plain and unambiguous terms are to be enforced as written and "will not give away to what the parties thought that the agreement meant or intended it to mean." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. Ct. App. 1999) (internal quotation marks and citation omitted); *Layne*, 820 N.E.2d at 869.

[4]The integration clause states:  "This Stipulation sets forth the entire understanding of the parties hereto with respect to the matters described herein, and cannot be modified except in a writing signed by the parties and approved by the Court."

[5]Assuming arguendo that the district court should have considered the affidavits, those documents do not create a genuine issue of material fact.  The affidavits do not state, as plaintiffs maintain, that "GE HFS informed DeMarco and Saad that the accounts of DRS and DERS were qualified accounts and, thus, GE HFS would fund the $250,000.00 post-petition loan."  Indeed, the

C.

Plaintiffs also contend that they should have been permitted to introduce extrinsic evidence of GE HFS's alleged promise to advance $250,000 as evidence of fraudulent inducement. Specifically, plaintiffs maintain that Saad pledged additional assets and agreed to increase his personal guaranty based on GE HFS's alleged representation to DeMarco that the DRS and DERS accounts were "Qualified." "However, the parol evidence rule may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing." *Galmish v. Cicchini*, 734 N.E.2d 782, 790 (Ohio 2000) (internal quotation marks and citation omitted). It is well-established under Ohio law that:

> A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth merely by looking when he signed. . . . I[f] this were permitted, contracts would not be worth the paper on which they were written.

*Dice v. Akron, Canton, & Youngstown R.R. Co.*, 98 N.E.2d 301, 304 (Ohio 1951), *rev'd on other grounds,* 342 U.S. 359 (1952). Thus, the district court correctly denied plaintiffs' request to consider the affidavits of DeMarco and Saad as evidence of fraudulent inducement.

IV.

---

DeMarco Affidavit does not mention DRS or DERS at all. The Second Saad Affidavit represents only that Saad would make the DRS and DERS accounts receivable "available" as collateral. Like the DeMarco Affidavit, Saad's affidavit is silent about whether such accounts were understood to be "Qualified."

Plaintiffs next argue that Saad's Revised Personal Guaranty as contained in the DIP Financing is invalid and unenforceable "due to a lack of consideration" because Saad provided the personal guaranty in order to obtain an additional $250,000 in post-petition financing, which GE HFS did not provide.[6] However, nothing in the DIP Stipulation, Amendment Eight, or the original Loan Agreement imposed upon GE HFS an obligation to immediately advance plaintiffs $250,000. In fact, the parties clearly contemplated the possibility that the post-petition financing would not be approved. In this regard, GE HFS only agreed to "consider" the post-petition financing, "subject to the terms set forth in the Agreements as modified by the terms of this Stipulation." Those agreements make it clear that no due diligence had taken place and that GE HFS had "sole and absolute discretion" in determining whether DRS and DERS had "Qualified Accounts" to borrow against.[7] For the reasons explained above, GE HFS was unable to approve post-petition financing because there was evidence to support a conclusion that DRS and DERS were not "Qualified Accounts." Thus, we hold that plaintiffs' argument fails as a matter of law.

V.

---

[6]To the extent plaintiffs seek to rely on extrinsic evidence presented by Saad and DeMarco regarding their alleged subjective intent in entering into the DIP Stipulation, such evidence is inadmissable for the reasons already explained – the DIP Stipulation is clear and unambiguous and contains an express integration clause.

[7]Moreover, under Ohio law, GE HFS performed its obligations under the DIP Financing in good faith because it exercised its rights according to the written terms of its contracts. *See Astor,* 7 F.3d at 539. As the district court reasonably noted, "the fact that GE funded a $512,000.00 advance to Plaintiffs on November 26, 2003, under a separate account undercuts any allegation that GE was acting in bad faith."

Plaintiffs argue that the settlement payment of $4,250,000 completely extinguished all outstanding obligations owed to GE HFS. In support of their claim, plaintiffs cite the district court's second summary judgment order of August 16, 2007, where it denied GE HFS's motion for summary judgment on the issue of the $400,000 carve out and stated that "the Plaintiff Companies have no remaining obligations to GE." However, plaintiffs ignore that the district court made this finding within the specific context of the issue raised in GE HFS's second motion for summary judgment: whether the $400,000 carve out was constructively paid in satisfaction of the *secured* claim. Although the district court ruled that constructive payment had occurred and that the *secured* claim was satisfied, it did not make any factual findings at that time regarding the *unsecured* claim that GE HFS might have against plaintiffs. Indeed, if the district court had found that the $4,250,000 secured claim was the only debt owed, it logically would not have requested further briefing, as it did, on the issue of attorneys' fees.

Moreover, the district court's August 16, 2007, finding is entirely consistent with the Settlement Term Sheet, which was approved by the bankruptcy court:

> *The GE Creditors assert a Secured Claim and an Administrative Claim against the Debtors' estates; and those Claims currently total more than $4,900,000.00.* The Claims of the GE Creditors consist of: (a) the GE HFS Secured Claim balance as of October 1, 2004 (immediately before the $3,500,000.00 payment to GE HFS on October 1, 2004) in the amount of $4,298,548.42; (b) all charges (including, but not limited to, continuing interest accruals, legal fees, and costs) that GE HFS has incurred and asserts that it is entitled to recover as part of its Secured Claim from and after October 1, 2004; and (c) a GE Med Administrative Claim of at least $77,489.54 arising from the Debtors' post-petition use of equipment leased from GE Med under leases subsequently rejected by the Debtors.

(Emphasis added.) The July 25, 2005, bankruptcy court opinion approving the Settlement Term Sheet reiterates these terms and recognizes that "GE HFS asserts a *secured claim as of October 1, 2004 of $4,298,548.42 plus charges including* interest accrual, *legal fees, and costs provided for in the financing documents*." (Emphasis added.)

Thus, it is apparent from the Settlement Term Sheet and the bankruptcy court's opinion that GE HFS asserted three claims against plaintiffs: (1) a secured claim; (2) an unsecured claim for charges (including, but not limited to, attorneys' fees and costs); and (3) an administrative claim (which is not at issue in this case). Those claims totaled more than $4,900,000.[8] The parties to the court-approved settlement of the bankruptcy cases agree that $4,250,000 of that amount consisted of the secured claim. However, payment of the $4,250,000 did not extinguish all of plaintiffs' obligations, which they contracted to pay and guaranty.[9]

---

[8]In its opinion, the bankruptcy court stated that "GE HFS asserts a claim of more than $4.9 million, secured by essentially all of the debtors' assets."

[9]The Settlement Term Sheet expressly reserved GE HFS's right to pursue the remaining deficiency claim (i.e., the unsecured portion of its claim) against Saad and the non-debtor companies:

> While the GE Creditors covenant with the Debtors' estates not to seek further recovery from the Debtors' estates after GE HFS receives indefeasible payment of $3,850,000.00 (the $3,500,000.00 payment received October 1, 2004 and the further $350,000.00 indefeasible payment provided in subparagraph 3(b) above), *the GE Creditors reserve and do not release their claims against Dr. Saad and the non-debtor entities.*

(Emphasis added.)

Because the record supports the district court's determination that settlement of GE HFS's secured claim of $4,250,000 in the bankruptcy proceedings did not include attorneys' fees and costs accrued after October 1, 2004, we affirm the district court's ruling on this issue.

VI.

Next, plaintiffs contend that the district court erred in granting summary judgment to GE HFS on its counterclaim because of an alleged factual dispute as to the amount GE HFS was owed. They argue that the record supports three possible conclusions: (1) GE HFS was entitled to less than $4,250,000; (2) GE HFS was paid in full when it received $4,250,000; or (3) "simply that there was/is a factual dispute as to the amount that [GE HFS] was owed and/or the amount [GE HFS] was paid."

A.

Plaintiffs assert that GE HFS cannot be owed more than $3,405,531.40, comprised of a principal balance of $3,314,851.25 (the effective loan balance as of the November 21, 2003, filing date of the bankruptcy cases), plus interest of $90,680.21 (at the rate of 7.5%) through October 1, 2004. However, plaintiffs' allegation regarding the principal balance of its obligation to GE HFS is predicated entirely on part of a loan interest statement from November 2003, before the bankruptcy cases were filed. But, GE HFS is owed the balance under the Loan Agreement and the DIP Financing as of October 1, 2004 (almost a year after the filing of the bankruptcy cases and after substantial accruals to the claim). The November 2003 loan interest statement, cited by plaintiffs, actually confirms the accuracy with which GE HFS calculated its claim. GE HFS's claim calculation

starts from the same loan interest statement; the GE HFS calculation simply includes the loan interest statements for the period after the filing of the bankruptcy cases through the October 1, 2004, calculation date and adds accrued attorneys' fees and other charges. These loan interest statements show how the amount of GE HFS's claim increased over time. Plaintiffs cannot create a genuine issue of material fact by relying upon part of a loan interest statement that sets forth an historical claim number, and then ignore all the subsequent statements for the applicable period of time.[10]

B.

Moreover, the amount of GE HFS's secured claim was resolved by the settlement of the bankruptcy cases. On July 25, 2005, the bankruptcy court allowed GE HFS a $4,250,000 secured claim under the Loan Agreement and the DIP financing proposed by the Unsecured Creditors Committee and GE HFS, and supported by the Chapter 11 Trustee ("Trustee") appointed for the Debtor Companies. In approving the settlement, the bankruptcy court noted that it was the Trustee's evaluation that "it is likely that GE HFS will have a *secured* claim of not less than $4.25 million."[11]

---

[10]Plaintiffs assert that no advances were made after the November 21, 2003, filing date of the bankruptcy cases. This is demonstrably false. GE HFS made a $512,000.00 advance to the Debtor Companies under the Loan Agreement and the DIP Financing on November 26, 2003. The district court correctly recognized this fact in its September 21, 2006, order on GE HFS's first motion for summary judgment.

[11]In considering whether to approve a proposed compromise, "[t]he bankruptcy court . . . is obligated to weigh all conflicting interests in deciding whether the compromise is 'fair and equitable,' considering such factors as the probability of success on the merits, the complexity and expense of litigation, and the reasonable views of creditors." *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988) (citation omitted); *accord Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

(Emphasis added.) The bankruptcy court further recognized that, as of the date of the settlement hearing in June 2005, "[t]he GE Creditors' claim [i.e., GE HFS's claim plus approximately $77,500.00 owed to GE Med] totals more than $4.9 million."

As GE HFS states, "[a]ll of the Plaintiff Companies (controlled by Dr. Saad), and Dr. Saad personally, received notice of the Settlement and had the opportunity to object[.]"[12] None of them objected to either the proposed settlement or the bankruptcy court's entry of final judgment in the adversary proceeding, to which the Trustee stipulated in accordance with the settlement agreement.[13] Moreover, none of them appealed either the bankruptcy court's final order approving the settlement or the stipulated final judgment.[14]

Finally, the district court also examined the amount of GE HFS's claim and accepted the bankruptcy court's determination that GE HFS had a secured claim of $4,250,000. Plaintiffs have failed to provide the district court or this court with any evidence that effectively challenges this

---

[12]Administrative creditors Hahn Loeser & Parks and Kline and Associates, LLC, who provided professional services to the debtors, filed objections. Hahn Loeser & Parks' claim was for attorneys' fees incurred as counsel to the debtor and debtor-in-possession. Kline served as the accountant.

[13]Plaintiffs complain that "[n]either the Deaconess Debtors, Dr. Saad, Nour, DRS, nor DERS were parties to the settlement." However, all interested parties to the proceeding were provided notice and the opportunity to object to the settlement, as demonstrated by the objections filed by administrative creditors Hahn Loeser & Parks and Kline and Associates, LLC.

[14]If there had been an appeal, a bankruptcy court's decision "authorizing the trustee in bankruptcy to enter into a compromise of creditors' claims rests in the sound discretion of the [bankruptcy] judge. A reviewing court will not disturb or set aside such a compromise unless it obviously achieves such an unjust result as to amount to an abuse of discretion." *Mach. Terminals, Inc. v. Woodward* ( *In re Albert-Harris, Inc.*), 313 F.2d 447, 449 (6th Cir. 1963).

decision. Accordingly, we affirm the district court's finding that GE HFS had a secured claim of $4,250,000.

## VII.

On the issue of attorneys' fees, the district court found that:

> The documentation submitted by GE HFS undisputably show that attorneys' fees and costs in the Bankruptcy Cases, the Adversary Proceeding, and the District Court Litigation totaled $1,545,276.01. GE HFS has clearly showed that the settlement payment of $4,250,000 satisfied outstanding principal, interest, other recoverable costs and charges, and all but $47,667.78 in legal fees through October 1, 2004. A deficiency, therefore, exists for the $47,667.78 in legal fees that GE HFS incurred prior to October 1, 2004. A deficiency also exists for all legal fees and costs incurred by GE HFS after October 1, 2004, or $1,037,790.35. In total, GE HFS has shown that a total deficiency of $1,085,458.13 exists for which it can collect if the attorneys' fees provisions are enforceable against the [plaintiffs].

In this appeal, plaintiffs argue that: (1) the attorneys' fees provisions in the loan documents are void as against public policy; (2) the attorneys' fees and costs GE HFS incurred do not relate to the enforcement of a contract of indebtedness; and (3) the attorneys' fees and costs are not reasonable. We address each of these arguments in turn.

## A.

Plaintiffs contend that GE HFS is precluded from enforcing the attorneys' fees provisions because such provisions are void as against public policy "under long standing Ohio common law[.]" (Citing *Miller v. Kyle*, 97 N.E. 372 (Ohio 1911); *CIT Group/Equip. Fin., Inc. v. New GIFL, Inc.*, 823 F. Supp. 479, 488 (N.D. Ohio 1993)); *see also State v. Taylor*, 10 Ohio 378, 381 (1841). However, the rule articulated in *Taylor* and *Miller* is qualified. Under Ohio law, contractual provisions requiring the payment of attorneys' fees are enforceable when arrived at "through free and

understanding negotiation" and where both parties "were able to protect their respective interests." *Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 253, 258 (Ohio 1987); *see also Nottingdale Homeowners' Ass'n, Inc. v. Darby*, 514 N.E.2d 702, 705 (Ohio 1987) ("*Miller* is factually a far cry from the case now before us which involves a specific contractual provision that was assented to in a non-commercial setting by competent parties with equal bargaining positions and under neither compulsion nor duress."); *Chase Manhattan Mortgage Corp. v. Tudor*, No. 2:06cv26, 2007 WL 4322187, at *5 (S.D. Ohio Dec. 7, 2007).

> The district court made the following findings:

> Here, it is clear from the record that the parties' bargaining positions were not unequal. The record shows that Dr. Saad is a sophisticated medical professional and business man. He was represented by counsel while negotiating the relevant transactions. He agreed to important amendments and negotiated his own amendments during the course of the events described. Furthermore, he has presented no evidence to suggest that he entered into the agreements from a position of unequal power.

Because the parties were not of unequal bargaining power and Ohio law expressly allows for attorneys' fees, we hold that the attorneys' fees provisions at issue were not invalid as contrary to Ohio public policy.

B.

In addition, the general rule against attorneys' fees articulated in *Taylor* and *Miller* was abrogated by Ohio Revised Code § 1301.21, which governs the enforcement of a commitment to pay attorneys' fees in commercial contracts of indebtedness.[15] Section 1301.2 allows for an award of

---

[15]A "'[c]ontract of indebtedness' means a note, bond, mortgage, conditional sale contract, retail installment contract, lease, security agreement, or other written evidence of indebtedness, other

attorneys' fees, provided that: (1) the parties entered into a contract of indebtedness; (2) the contract

"includes a commitment to pay attorneys' fees"; (3) "the contract is enforced through judicial

proceedings or otherwise after maturity of the debt"[16]; (4) "the total amount owed on the contract of

indebtedness at the time the contract was entered into exceeds [$100,000]"; and (5) the obligation

is for "a reasonable amount." OHIO REV. CODE ANN. § 1301.21(B), (C), & (D) (West 2008).

Here, it is clear that plaintiffs and GE HFS entered into a contract of indebtedness, that the

contract contained a commitment to pay attorneys' fees, and that the total amount owed on the

contract exceeded $100,000. Plaintiffs argue, however, that: (1) the fees GE HFS incurred in the

bankruptcy cases, the adversary proceeding, and in the present suit to defend against plaintiffs'

claims do not relate to the enforcement of a contract of indebtedness, and (2) the amount of the

attorneys' fees awarded to GE HFS was not reasonable.

The district court found that GE HFS's defense of the claims asserted against it by plaintiffs

and GE HFS's prosecution of its counterclaim against plaintiffs both relate to the enforcement of the

---

than indebtedness incurred for purposes that are primarily personal, family, or household." OHIO REV. CODE ANN. § 1301.21(A)(1) (West 2008).

[16]"'Maturity of the debt' includes maturity upon default or otherwise." OHIO REV. CODE ANN. § 1301.21(A)(3) (West 2008). Regarding this requirement, the district court stated:

> Here, the parties both acknowledge that the [plaintiffs] defaulted on their obligations under the Loan Agreement in 2003. The [plaintiffs] attempt to argue that they were current in their obligations under the Settlement Agreement, but the Settlement Agreement is not the relevant document for this analysis. It is the Loan Agreement and the Revised Personal Guaranty that constitute the relevant "contract of indebtedness."

contract of indebtedness. In support of its holding, the district court relied on decisions from both the Eighth and Tenth Circuits:

> In *Duryea v. Third Northwestern Nat'l Bank of Minneapolis*, 606 F.2d 823, 825 (8th Cir. 1979), the Eighth Circuit held that finding otherwise would lead to an undesirable result:
>
>> If the Bank had instituted suit to collect the note and plaintiff had, by way of counterclaim, served the complaint that is the basis of this action, all costs of both bringing suit and defending against the counterclaim would be "costs of collection" of the note. This court sees little difference where plaintiff brings suit to [p]revent collection of the note. Because it is necessary for the Bank to defend against such an action in order to collect on the note, attorney's fees incurred in defending against plaintiff's suit are a "cost of collection" as that term is used in the note. A contrary result would permit the maker of a note by winning the "race to the courthouse" to coerce settlement. This would render the "cost of collection" provision of little value, apparently contrary to what the parties to the note intended. *Id*. at 826.
>
> Other circuits have similarly held that defending an action in order to collect on a note constitutes a cost of collection or enforcement. *See, e.g., Univ. Drilling Co. v. Camay Drilling Co.*, 737 F.2d 869, 875-77 (10th Cir. 1984).

Here, all of the loan documents and the DIP Order expressly provide for the payment of attorneys' fees and costs. GE HFS enforced the loan documents and the DIP Order through judicial proceedings via its counterclaim in the district court. All of the attorneys' fees and costs that GE HFS sought were incurred as a result of the bankruptcy cases, the adversary proceeding, and the district court litigation. GE HFS's efforts in each of those cases relate to the enforcement of its claim against the jointly and severally obligated Borrowers (both the Deaconess Debtors and the non-Debtor Companies) and Guarantor Saad, or to GE HFS's necessary defense of its claim.

Accordingly, we hold that the attorneys' fees and costs GE HFS incurred in defending against the claims asserted by plaintiffs are fully recoverable provided they are reasonable.

C.

Finally, plaintiffs contest the reasonableness of the $1,085,458.13 in legal fees and costs amassed by GE HFS.[17] In determining what constitutes a "reasonable amount" of fees under § 1301.21, paragraph (D) places the burden on plaintiffs to show that GE HFS's fees are improper:

> In determining the amount of attorneys' fees that is reasonable, all relevant factors shall be considered, including but not limited to, the nature of the services rendered, the time expended in rendering the services, the amount of money and the value of the property affected, and the professional skill and expertise of the attorney or attorneys rendering the services. Unless a court has been requested to make a determination of the amount of attorneys' fees that is reasonable and finds to the contrary by a preponderance of the evidence, the following are deemed reasonable amounts:
>
> * * *
>
> (2) If the commitment to pay attorneys' fees is not based upon a specific percentage of the total principal, interest, and other charges owed on the contract of indebtedness, an amount equal to the attorneys' fees customarily charged by the attorney or attorneys rendering the services.

OHIO REV. CODE ANN. § 1301.21(D). Thus, Section 1301.21 requires that plaintiffs show, by a preponderance of the evidence, that GE HFS's fees are in excess of those "customarily charged." "[M]erely pointing the Court to an anomalous fee is not sufficient. Section 1301.21(D)(2) takes a subjective view, requiring that a debtor show why the particular fee is not 'customarily charged by

---

[17]Citing Saad's Revised Personal Guaranty, plaintiffs argue that the district court erred to the extent that it imposed upon Saad any obligation to personally pay an amount in excess of $1,000,000. Because the parties do not appear to dispute this issue, we hold that Saad's personal obligation is limited to a maximum amount of $1,000,000.

the attorney or attorneys rendering the services.'" *In re McKenna*, 362 B.R. 852, 857 (Bankr. N.D. Ohio 2006) (quoting OHIO REV. CODE ANN. § 1301.21(D)(2)).

Here, plaintiffs failed to satisfy their evidentiary burden because they did not provide the district court with evidence demonstrating that the attorneys' fees incurred by GE HFS are in excess of those "customarily charged." On the other hand, GE HFS submitted substantial evidence to the district court, including counsels' invoices, biographies of its attorneys, and counsels' declarations, that show the reasonableness of their attorneys' fees. After reviewing this evidence, the district court determined that the rates charged by GE HFS's counsel were reasonable and that their time spent on this matter was "reasonably expended, especially in light of the complicated and protracted nature of the case." We find no clear error in the district court's determination and therefore affirm the district court's award of attorneys' fees and costs.

## VIII.

For these reasons, we affirm the judgment of the district court.